## The People *vs.* William Haynes.

It is unnecessary to state, in an indictment, the names of the jurors by whom it is found.

An indictment for arson need not charge that the setting fire to the building was willfully done. A charge that the defendant "unlawfully, maliciously and feloniously, in the night time, did set fire to a certain grist-mill," is equivalent to a charge that the act was willfully done. It is, in point of fact, a charge that it was *designed*, intended, and hence willful.

A charge that the defendant "set fire to a certain grist-mill, then and there being, owned by, and in the possession of, one W.," is sufficient to meet the requirements of the statute as regards the crime of arson in the third degree.

It is not an inflexible rule of law that a jury may not, in a criminal case, convict a defendant upon the uncorroborated testimony of an accomplice; the fact of the witness being a confederate going to his or her credibility, only.

The statements of such a witness are to be received with great caution. If, however, they carry conviction to the mind of the jury, and they are fully convinced of their truth, they may convict, upon them.

It is, however, the duty of a jury to scan the testimony of an accomplice with the utmost severity; and as verdicts rendered upon the uncorroborated evidence of confederates are of doubtful propriety, they will not, in general, be allowed to stand if the witness be otherwise impeached.

In such cases, a just regard to the rights of the accused demands an observance of the strictest rules in the admission or rejection of evidence.

The mere fact that evidence tends to prove that the accomplice is truthful in some respects is not sufficient to authorize its admission. It should be as to some fact the truth or falsehood of which goes to disprove the offense charged *against the prisoner.* It must tend to fix the guilt on the person charged; and the rights of the accused should not be prejudiced by confirmation on immaterial points, or as to facts which in no way connect him with the offense.

Where, on the trial of an indictment for arson, the alleged accomplice testified that the defendant promised her $400 to burn the building, and afterwards paid her $40 upon it, $30 of which she paid to W.; *Held* that it was improper to allow the district-attorney to prove by W., in corroboration of the statement of the accomplice, that she paid him $30, about the time stated by her.

Where witnesses were called to impeach the general character of the accomplice, and the district-attorney called witnesses to sustain it, who testified that prior to the fire they would have believed her on oath; *Held* that although such testimony might be proper, the jury were to determine the credit of the accomplice *at the time she testified.* That the defendant was entitled to ask them, on cross-examination, whether they would believe her on oath *at the time of the trial;* and that the court erred in sustaining an objection to such question.

The People *v.* Haynes.

*Held,* also, that the fact that the court had limited the number of impeaching and sustaining witnesses to six, and the defendant had called that number, did not change the rule. That such restriction did not limit the right of putting questions, on cross-examination of the sustaining witnesses, with a view to test the value of their opinions as to the integrity of the accomplice, as a witness, *at the time* of the trial.

THE defendant was convicted at the Schenectady oyer, in 1868, of the crime of arson, in the third degree. The specific offense charged in the indictment was, that on the 4th April, 1867, he feloniously, in the night time, set fire to a certain grist-mill, the property of one Frederick Whittlesy.

On the trial, evidence was given by one Margaret A. Bronk, that she set the fire at the request and on the instigation of the defendant, who, as she testified, prepared the material to be ignited, and was, at the time, in the immediate vicinity of the mill, with the purpose of rendering aid in effecting her escape from the premises if necessity required. · The conviction rested solely on the evidence given by this witness; the corroborating testimony, if indeed there was any, being so slight and insignificant as to be unworthy of notice. The witness, a married woman, aged about twenty-five years, testified that she had been for many years on terms of criminal intimacy with the defendant; that he was the father of two of her children; that their intimacy was at the time known to her husband; that their relations for a time prior to the fire were unfriendly, but that they had become reconciled and again intimate. The witness further stated that the defendant first asked her to induce her husband to burn the mill, and it being suggested to him he refused; that the defendant had given her money at various times—on one occasion four $10 bills; that she paid $10 to Mr. Stevens, and the rest to one Westfall; that the defendant stated to her as his reason for wishing the destruction of the mill, that he wanted to get the mill-seat. The defendant formerly

owned the mill premises, and sold them to Whittlesy in 1864, but had been fully paid therefor; the last payment having been made in February preceding the fire, to prevent a foreclosure of a mortgage taken by the defendant for part of the purchase money. After such payment the defendant had no right or interest in the property destroyed. Evidence was also given tending to an impeachment of the witness irrespective of her position as an admitted accessory to the crime charged against the defendant. She was contradicted in some of her statements, and evidence of general bad character was given. The counsel for the defendant asked the court to direct an acquittal on the grounds: (1.) That the indictment did not contain the names of the jurors by whom it was found. (2.) That it did not charge that the setting fire to the building was willfully done. (3.) That it did not charge expressly or by implication that the building alleged to have been burned was not the subject of arson in the first degree. The court declined to direct an acquittal, as requested, and the counsel excepted. Exceptions were also taken to the admission and rejection of evidence, and also to portions of the charge as well as to refusals to charge, which exceptions are hereafter considered, in so far as they are deemed to affect the rights of the defendant.

*John L. Hill,* (district-attorney,) for the people.

*N. C. Moak* and *Henry Smith,* for the defendant.

*By the Court,* BOCKES, J. The refusal of the court to direct an acquittal of the defendant was manifestly right. It was unnecessary to state in the indictment the names of the jurors by whom it was found. This was expressly decided in the case of *The People* v. *Bennett,* (37 *N. Y. Rep.* 117.) The second objection urged, that the indictment omits to charge that the setting fire to the building was willfully

done, was not well founded in fact. It was charged that Haynes "unlawfully, maliciously and feloniously, in the night time, did set fire to a certain grist-mill." This language is equivalent to a charge that the act was willfully done. It is, in point of fact, a charge that it was *designed*, intended, hence willful. The third ground of objection is also untenable. The charge is, that the defendant "set fire to a certain grist-mill, then and there being, owned by and in possession of one Frederick Whittlesy." This was sufficient to meet the requirements of the statute as regards the crime of arson in the third degree, which declares the willful setting fire to "a grist-mill" to be arson in the third degree.

The case was plainly one for the jury, on the evidence. It would have been manifestly improper to have taken it from them on any of the grounds urged. It is true the only evidence to establish the guilt of the party was the uncorroborated testimony of a confederate in the crime. But whatever opinion the court may have entertained in regard to the integrity and reliability of the witness, the question of guilt or innocence was for the jury. The witness was not incompetent to testify, because an accomplice. Such admitted fact affected her credibility only, and it was for the jury to say whether her statement was credible and a safe reliance for a verdict against the party charged. Such is now the settled rule in this State, even where the accomplice stands entirely uncorroborated. Mr. Justice Beardsley remarked in *The People* v. *Costello*, (1 *Denio*, 83,) that "although it has often been said by judges and elementary writers, that no person should be convicted on the testimony of an accomplice, unless corroborated by other evidence, still there is no such inflexible rule of law. It is a question for the jury, who are to pass upon the credibility of an accomplice, as they must upon every other witness." He adds, "his statements are to be received with great caution, and the court should always so advise;

but after all, if his testimony carries conviction to the mind of the jury and they are fully convinced of its truth, they should give the same effect to such testimony as should be allowed to that of an unimpeached witness who is in no respect implicated in the offense." This language of Mr. Justice Beardsley was quoted with approval in *Haskins* v. *The People,* (16 *N. Y. Rep.* 344–352.) Judge Comstock said in *The People* v. *Dyle,* (21 *id.* 578, 9:) " There is no rule of law which prevents a conviction on the testimony of an accomplice alone. The utmost caution should undoubtedly be exercised; but juries are nevertheless at liberty to convict on the unsupported testimony of a confederate in the crime." To the same effect are the remarks of Mr. Justice Ingraham in *Dunn* v. *The People,* (5 *Park. Crim. Rep.* 120;) see also 1 *Greenleaf on Ev.* §§ 380, 381. But, notwithstanding the jury may convict on the unsupported testimony of an accomplice, yet it is, as remarked by Mr. Greenleaf, so generally the practice on the trial for the court to advise an acquittal in the absence of corroborating proof, that its omission would be regarded as an omission of duty on the part of the judge; and the same learned writer on the law of evidence, adds that so great respect is always paid by the jury to such advice from the bench, that it may be regarded as the settled course of practice, not to convict in any case of felony upon the sole and uncorroborated testimony of an accomplice.

It is a well settled rule, not to be departed from in criminal cases especially, that no issue shall be decided against a citizen without testimony equivalent at least to that of one credible witness. Therefore verdicts rendered on the testimony of confederates wholly uncorroborated, are of doubtful propriety, and will not in general be allowed to stand, if the witness be otherwise at all impeached.

It was the manifest duty of the jury in this case to scan the testimony of Mrs. Bronk with the utmost severity. In

addition to the fact that she admitted herself to be a felon, she was shown to be unblushing in her immoralities and notoriously untruthful. While several witnesses testified to the contrary, not one of the eleven who spoke to her general character gave the opinion that she was *then* a credible and reliable person. She was also contradicted in her statements given as a witness on the stand. Nor does her story commend itself to the fullest credence, by reason of its inherent probability. It is difficult, if not impossible, to find a motive for the crime. There was no ill feeling existing between the defendant and Whittlesy, the owner of the mill, to excite hatred or induce revenge. Their relations were friendly. The defendant had no direct interest to be subserved by its destruction. The remote hope (as stated by Mrs. Bronk) that he might obtain the mill-seat, should the mill be burned, was infinitely weak as an inducement to commit a high crime. His chance of obtaining it would then be one in common with that of all his neighbors and others who might desire to secure it by fair, open purchase. The destruction of the mill gave him no advantage over other competitors for the site. Again; she testified that the defendant wanted her to get her husband to burn the mill for him; that she mentioned the subject to him, and he refused, saying that the defendant hadn't money enough to hire him to do it; that he could not get him to states prison. Was it not strange indeed that the defendant should seek the aid of a man in the commission of a crime, whose jealousy and hatred were already aroused by reason of his known intimacy with his wife? Would he not be cautious about putting himself in that man's power? Mrs. Bronk says the defendant then persuaded her to burn the mill. Was it not strange that he should put himself in her power? Why not do the act himself and avoid the risk of having his purpose known to others? He did not seek to avoid suspicion by absence, for Mrs. Bronk says he was at or

near the mill when she applied the match; and he must therefore have fled from it with her, or at the same time she did. It was in proof that he was at his own house when the alarm was given.

Now, in this condition of the case, the jury must have been in some doubt—some perplexity—as to the propriety of convicting on the testimony of this confederate. They are presumed to have been warned by the court of the danger attending a conviction on testimony from a source confessedly corrupt. They doubtless examined the evidence with great care, as they had been instructed and were bound to do, considering every minute circumstance tending in the least degree to a corroboration of the statement made by the witness. They would be undoubtedly influenced by slight confirmatory facts; very little would turn the scale and control the verdict. A just regard to the rights of the accused, therefore, demands an observance of the strictest rules in the admission and rejection of evidence. Let us now see if any evidence was improperly admitted bearing on the question of corroboration.

Mrs. Bronk testified that the defendant promised her $400 if she would burn the mill; which sum would buy for her a place she desired to purchase. It seems that the place was owned by Westfall, for whom Stevens was agent. She further testified, that soon after the fire, Stevens called on her and inquired if she wanted the place; whereupon she went to the defendant, at the paper mill, and obtained from him forty dollars—four ten dollar bills; that she paid Stevens ten dollars, and afterwards went to Quaker street to complete the transaction, and there paid the balance of the money ($30) to Westfall. Stevens was called, and testified that Mrs. Bronk gave him ten dollars—a ten dollar bill—to bind the bargain for the place; then arranged with him to meet him at Quaker street to complete the transaction for the property; and that they met at Quaker street, pursuant to the arrangement, and

The People *v.* Haynes.

then she paid three ten dollar bills to Westfall's agent. All and every part of this evidence was admitted against the defendant's objection. If the evidence tended to corroborate Mrs. Bronk in any material part of her testimony, it was properly admitted, otherwise its admission was error, inasmuch as it was urged upon the consideration of the jury as matter of corroboration, and doubtless to a greater or less extent influenced their verdict. Unquestionably this evidence tended to prove that Mrs. Bronk told the truth in several particulars. But that alone was not sufficient to authorize its admission as corroborating proof. As was said in *Rex* v. *Addis*, (6 *Car. & P.* 388,) "The corroboration of an accomplice ought to be as to some fact or facts, the truth or falsehood of which go to prove or disprove the offense charged against the prisoner." To the same effect is the decision in *The Commonwealth* v. *Bosworth*, (22 *Pick.* 397;) also in *Rex* v. *Webb*, (6 *Car. & Payne*, 595;) and in *Rex* v. *Wilkes*, (7 *id.* 272.) In the latter case, Alderson, B., says: "The confirmation which I always advise juries to require, is a confirmation of the accomplice in some fact which goes to fix the guilt on the particular person charged." I am aware that there are cases holding that the confirmatory proof need not in all instances affect the identity of the accused, or necessarily connect him with the offense charged. But the decisions above cited are now held better to accord with sound principles of law. It seems, therefore, that if corroborating evidence be admitted, it must be such as has some necessary connection with the guilt of the party charged, or of the correctness of the statement of the accessory in relation to such evidence. True, a party may be convicted (although he in general will not be) on the uncorroborated evidence of an accomplice; but if the case is to be strengthened by corroborating proof, the rights of the accused should not be prejudiced by confirmation on immaterial points, or as to facts which in no way connect

him with the offense. Mrs. Bronk testified that the defendant agreed to arrange, and in fact arranged, the combustibles, left the window open for her to enter, placed a box under the window, to render access easy, was near the mill when she set the fire, and left the building; that he then signaled her. All these facts were material on the question of the defendant's guilt; and proof of either, by the testimony of another person, would have been admissible to corroborate Mrs. Bronk. So, too, the fact of giving her money soon after the fire, she having sworn that he agreed so to do, if an unusual circumstance, or if the sum was unusual in amount, might be admissible. But the fact proved by other witnesses, that the mill was burned at the time she stated, was no corroboration of her testimony that it was burned at the defendant's instigation. She also swore that she met the defendant on the evening of the fire, in the street, and at her house, when the perpetration of the crime was arranged between them. For him to meet her at her house, or openly in the street, was no unusual circumstance. Would other proof of the fact that they so met have been corroborating evidence on the issue of the defendant's guilt? Clearly not. Proof of what they said, if overheard, and if it comported with her statement as to the arrangement to commit the crime, would have been corroborating evidence. So, too, proof by other witnesses of their intimacy, while it corresponded with her testimony as to that fact, did not corroborate her on the material point in issue. It seems to follow that proof of the simple fact that the defendant gave her money, which it appeared he was accustomed to do; and especially of the more remote and irrelevant circumstance, that she paid that or similar money to third persons, just as she testified she did, was not corroborating evidence that he employed her to commit the felony. Perhaps it was admissible to show that he in fact gave her money; but considered in connection with the additional fact that he

The People *v.* Haynes.

was accustomed so to do, it rested on the extreme verge of propriety.

The remaining evidence, introduced with a view to corroboration, that she arranged to meet a third person at Quaker street, to close the arrangement for the place, and that she in fact paid similar money to that she said she received from the defendant, to third persons, was clearly remote and irrelevant to the issue. This evidence was improperly admitted; and it was of a character, as the case stood before the jury, likely to affect their verdict. Its admission was therefore error.

It is also insisted that evidence bearing on the question of the credibility of Mrs. Bronk was improperly excluded.

The defense sought to impeach the witness by evidence of general character. Six witnesses were introduced, each of whom swore that her character was bad; that her reputation for truth was bad, and had been for a period extending back almost to her childhood; that they would not believe her on oath. Counter evidence was given on the part of the people, by five witnesses, who testified that they were acquainted with her character, and that they would, *prior to the fire and to her arrest*, have believed her on oath. On cross-examination of two of these witnesses, the defendant's counsel sought to show that her character at the time she testified was bad, and that they would not then believe her on oath. This evidence was objected to, (1.) On the ground that the inquiry should be limited to what her character was before the fire. (2.) That the number of impeaching witnesses had been limited by the court to six on a side, and that the defendant had exhausted his full complement. The objection was sustained, and the evidence excluded. If excluded on the first ground of objection, it was manifest error. The jury were to determine the credibility of the witness at the time she testified. The question for them was whether she was then, at the time she spoke, a truthful and reliable witness. It

was competent for the district-attorney to fix the limit of his inquiry at some prior period, but the point to be reached by the proof was, for all that, her standing for truth and veracity at the time she testified. As was said in *Willard* v. *Goodnough,* (30 *Verm. Rep.* 397,) "it is practically impossible to limit the scope of the answer to any particular period. The testimony, when given under such a question, will bear more or less strongly upon the present character of the impeached witness, according as it fixes the existence of the bad character at a more or less recent point of time. * * * The present character is the point in issue. What the character formerly had been is relevant only as it blends with the continuous web of life and tinges its present texture." See also *Rucker* v. *Beaty,* (3 *Ind. Rep.* 70;) *Rogers* v. *Lewis,* (19 *id.* 405;) *Arnold* v. *Cobb,* (21 *id.* 492.)

So it might be argued, that if Mrs. Bronk was a person whose statements upon oath were to be credited before the commission of the felony, she was still, under the circumstances of the case, at the time of testifying, also to be credited. In *Sleeper* v. *Van Middlesworth,* (4 *Denio,* 431,) Judge Beardsley remarked that the law indulged a strong presumption against any sudden change in the moral as well as the mental and social condition of man; that a state of mind once proved to exist is presumed to remain unchanged till the contrary appears. Now the district-attorney proved Mrs. Bronk to be a credible person, in the opinion of the witnesses, prior to the fire, and rested, as well he might, according to Judge Beardsley, on the presumption which such opinion supported. The defendant then had a right to meet and overthrow this presumption, by inquiring of the witnesses, on cross-examination, whether they would then believe her upon oath. If they would not, the argument and inference in favor of her credibility, based on her former standing in community, were effectually overcome; and if they would still deem her credible,

The People *v.* Haynes.

considering her present general character and her sworn admission of guilt, such fact was important with a view to test the value of their opinion favorable to Mrs. Bronk's integrity as a witness given on their direct examination. It is plain, I think, that this was a proper subject of inquiry on cross-examination of witnesses who had spoken to her credibility at a period long anterior to the trial.

But it is to be presumed that the evidence was excluded on the ground of objection secondly stated, to wit, that the number of impeaching witnesses had been limited to six on a side. It was undoubtedly competent for the court to limit the number of witnesses to be examined on the question of general character. But did such limitation as to number also limit the right of cross-examination? Palpably it did not; nor should it have that effect; otherwise the test of cross-examination would be rendered nearly valueless. The ruling as to numbers went no further than this, that each party might put six witnesses on the stand, to speak to the credibility of the person sought to be impeached. But when on the stand, the right of examination and cross-examination should not be infringed.

Give the ruling the effect claimed for it, and it would deprive the party against whom the witness was called of a substantial right—a right to test the capacity, integrity and means of knowledge possessed by the witness, by a cross-examination. The defendant was therefore entitled to the same right of cross-examination as if no ruling had been made in regard to the number of witnesses on the subject of impeachment; otherwise the limitation would be itself improper, inasmuch as it would deprive the party against whom the witness was called, of a right always deemed of the utmost consequence—a right of full and searching cross-examination. In my judgment, the cross-examination was here improperly abridged.

In conclusion, it may be remarked, that when a case is

sought to be established by the testimony of an accomplice, who stands in the main, if not wholly uncorroborated, it is due to the party accused and to the cause of justice; that none but evidence clearly admissible under the severest test should be allowed; and that none in the least bearing on the question of credibility, and admissible, should be excluded. Mr. Justice Beardsley well remarked, in *The People* v. *White*, (14 *Wend.* 114,) that "when the case is one of delicacy and importance, and the evidence is nicely balanced, and the scale liable to be affected by slight circumstances, the court will be exceedingly vigilant in preventing any extraneous or irrelevant matter from being brought before the jury." The same may also be said in regard to the rejection of evidence which it was the right of the party to lay before the jury for their consideration.

Now, in this case, the only direct evidence of guilt was given by a confederate in the crime. The witness was a conceded felon. The evidence on which the conviction was predicated came from a source admittedly corrupt. The case before the jury was, therefore, one of extreme delicacy, and the accused had the right to insist that it should be considered by them without possible error in the admission or rejection of evidence, tested by the strictest rules.

The charge of the learned judge who presided at the trial was eminently fair and impartial. The law of the case was clearly and explicitly stated, and his comments on the evidence were unexceptionable. In this regard the defendant has no cause for complaint. But, for the reasons above suggested, the verdict must be set aside, and a new trial ordered.*

[SCHENECTADY GENERAL TERM, January 5, 1869. *James, Rosekrans, Potter* and *Bockes*, Justices.]

* The defendant was acquitted, upon the new trial.