# Court of Appeals.

*November,* 1886.

## PEOPLE v. SHERMAN.

### LIBEL—EVIDENCE

An alleged libel, written by one L. was published in a newspaper published by a corporation with which all the defendants were connected. L., the author of the alleged libelous article, and one H., testified on behalf of the prosecution, that after the publication of the first edition containing the libel, having been sent to the comptroller's office to ascertain the truth of the statements in the article, that they made an examination there, and then returned and reported to defendants that the same was false and that an retraction thereof was written by H. in season for the second edition, but that defendants declined to publish it, and that the libelous article appeared in the second edition also. Defendants contradicted this evidence and denied any knowledge of the article till after the publication of the second edition. A witness was permitted to testify for the prosecution that the two witnesses L. and H. were at the comptroller's office about the time stated and made the examination of the books there as they had testified. *Held,* no error ; that the evidence added to the weight of the testimony on a material point, and, besides, corroborated the evidence of L., an accomplice.

APPEAL by defendant Charles G. Sherman, from a judgment of the General Term of the Supreme Court in the Third Department of 2 December, 1885, affirming a judgment of the Court of Sessions of Rensselaer County of 21 June, 1885, convicting the defendant of criminal libel.

The facts appear in the opinion. The indictment was as follows :

The grand jury of the County of Rensselaer, by this indictment, accuse Charles G. Sherman, William J. Tyner, Joseph McLaughlin, George H. McNamara, Sidney W. Giles, Cornelius J. Mackey, and Timothy J. Corcoran of the crime of libel, committed as follows : The said Charles G. Sherman, William J. Tyner, Joseph McLaughlin, George H. McNa-

mara, Sidney W. Giles, Cornelius J. Mackey and Timothy J. Corcoran, on the seventeenth day of November, 1882, at the City of Troy, in this county, unlawfully and maliciously contriving and intending to vilify and defame one Lawrence Sheary, and to bring him into public scandal and disgrace, and to injure, aggrieve and oppress him, the said Lawrence Sheary, at the City of Troy, aforesaid, on the day last aforesaid, unlawfully, willfully, and maliciously did write, compose, print and publish, and did unlawfully, wilfully and maliciously cause to be written, composed, printed and published in and for a certain newspaper published in the City of Troy, known as *The Evening Standard*, a certain false, scandalous, malicious and defamatory libel of and concerning him, the said Lawrence Sheary, containing, among other things, the false, malicious, defamatory and libelous words and matter following, that is to say: " Robbing the Laborers" —" The Meanest Steal yet "—" Another Chapter of Ring History " —" Cheating the poor Street Cleaner " (meaning men employed by the said City of Troy as laborers in cleaning the streets of said city)—" Where did the Money go to ? " (meaning the money appropriated, set apart, and credited on the books of said city for the payment of the wages of said laborers)—" A Nest of Rottenness "—" A Thorough Examination of the Books in Order "—" The true inwardness of ring rottenness as it continues to be brought to light through the columns of *The Standard* (meaning the newspaper printed and published by the aforesaid Charles G. Sherman, William J. Tyner, Joseph McLaughlin, George H. McNamara, Sidney W. Giles, Cornelius J. Mackey and Timothy J. Corcoran, and called ' *The Evening Standard*'), reveals a system of rascality and plunder never surpassed in municipal history. To-day we present another and the worst chapter yet in the record of the ring (meaning the aforesaid Lawrence Sheary and others). It shows a meanness and heartlessness which the gang (meaning the aforesaid Lawrence Sheary and others) was not thought capable of. The statement demonstrates how poor men, who have been employed to clean the streets

of the said city (meaning the aforesaid City of Troy), at from $25 to $28 per month, have been blackmailed and swindled out of part of their small wages monthly. *The Standard* (meaning the aforesaid newspaper called *The Evening Standard*, printed and published in the said City of Troy) has been put in possession of facts which go to show that men credited on the comptroller's (meaning the comptroller of the said City of Troy) books (meaning a book kept by the said comptroller, in which the account of the laborers employed upon the streets of the said City of Troy and others are entered) with drawing $28 a month, have, in at least some instances, been paid but $21 or less, and the balance has been retained, under the plea that the laborer (meaning the laborer employed upon the streets in said City of Troy) had not done his work well. ' Where did this deduction go to? ' There is no record of it on any of the city books (meaning the books kept in the various departments of the said City of Troy for the entry of transactions and accounts with the employes of said city and others), and the statement made to the mayor (meaning the mayor of said City of Troy), by the comptroller (meaning the comptroller of said City of Troy), yesterday, does not show that any such rebate came to the city (meaning the aforesaid City of Troy). ' A case in point.' The only inference is that someone (meaning the aforesaid Lawrence Sheary) has been guilty, quietly pocketing the balance. Certainly, if the comptroller's books (meaning the books kept by the comptroller of said City of Troy, for entry of accounts and transactions with the employés of said city and others) say a man received $28 in a given month, and the same satisfactorily proves that he received less, it is reasonable to suppose that someone (meaning the aforesaid Lawrence Sheary) has been stealing. And if the trick has been played on one man, is it not fair to believe it has been played on many more? Petty thieving from one poor laborer is beneath the dignity of a ring (meaning the aforesaid Lawrence Sheary and others) politician. He operates, if at all, on a large scale. Larry Sheary (meaning the aforesaid Lawrence Sheary) displayed

more anxiety about the late election (meaning at the last election, where a mayor of the said City of Troy was elected), than any other one of the ringsters. The development of recent date (meaning the scandalous, defamatory and libelous words and phrases hereinbefore set forth), plainly shows that he had more at stake than anyone of the men who had been feeding at the public crib (meaning the officers and employes of the said City of Troy). His discharge of all the street sweepers is now accounted for. He wanted to save himself, and thought that he would be all right if he succeeded in getting the men out of the way. But he is not all right. The discovery that he feared is now in progress (meaning that the composing, printing and publishing of the scandalous, libelous and defamatory words and sentence herein set forth, is now in progress). There is no question but that street sweepers (meaning laborers upon the streets and employés of said City of Troy) have been paid sums of money, every month, less than the amounts they are credited with on the comptroller's books (meaning the books kept by the comptroller of said City of Troy, for the entry of transactions and accounts with the employes of said City of Troy and others), for the same period. The case of John Sheehan, a street sweeper (meaning a laborer upon the streets in said City of Troy), is being cited as an example. He (meaning the said John Sheehan) had a contract (meaning a contract for labor upon the streets of the said City of Troy) for $28 per month. For the month of August (meaning the month of August in the year 1882), Sheehan (meaning the aforesaid John Sheehan) was paid $21, yet he is *credited with $28 on the comptroller's books*" (meaning the books kept by the comptroller of the said City of Troy aforesaid), to the great injury, scandal and disgrace of the said Lawrence Sheary, and against the peace of the people of the State of New York and their dignity.

*Denio & Gambel* (*N. C. Moak of counsel*), for appellants.

I. On the questions upon which there is a direct conflict in the evidence, the illegal admission or rejection of evidence

bearing in the slightest degree thereon entitles the party against whom the erroneous ruling is made to a new trial. *People* v. *Haynes,* 55 Barb., 450; *Baird* v. *Gillett,* 47 N. Y., 186; *Carroll* v. *Deimel,* 95 N. Y., 252; *N. Y. Guaranty, etc., Co.* v. *Gleason,* 78 N. Y., 503; *Anderson* v. *Rome, etc.,* 54 N. Y. 334.

2. The court erred in admitting the evidence of DeFreest to corroborate Hennessey and Lowrey as to their visiting the chamberlain's office and examining the books.

In *People* v. *Haynes,* 55 Barb., 450, Mrs. Bronk testified that defendant paid her money for burning the grist-mill, and that she paid one of the $10 bills to one Stevens and three of them to one Westfall. The trial court allowed evidence by Stevens that she did pay him one $10 bill and paid three of them to Westfall. For the admission of this evidence a new trial was awarded.

A party cannot sustain his own witness by proving by an *independent witness* he made the same statement at a prior time or as to an independent fact testified to by such witness. *Smith* v. *Stickney,* 17 Barb., 489; *People* v. *Finnegan,* 1 Park. Cr., 147; *Herrick* v. *Smith,* 13 Hun, 448; *People* v. *Rugg,* 21 W. Dig., 85; 34 Hun, 632, Mem.; affirmed without discussing that point; 98 N. Y., 537, 552; 2 N. Y. Crim., 172; *Stolp* v. *Blair,* 68 Ill., 541; *Childs* v. *State,* 55 Ala., 25; *Snyder* v. *Com.,* 85 Penn. St., 519; *Webb* v. *State,* 29 Ohio St., 351.

In *Powers* v. *Cary,* 64 Me., 10, libel for publishing an affidavit of one Anne Cornelison, and justification that it was true, it was held that a witness cannot be allowed, upon direct examination, for the purpose of strengthening her testimony, to state that she has made the same statement of the facts testified to by her at other times immediately after they were said to have occurred, to various persons.

The only cases where it may be proved to relieve a witness of an apparent discredit that he has made the *same statement* are :

    *a.* Where it is claimed his testimony was given under the

influence of some motive prompting him to make a false or colored statement, it may be shown that he made similar statements when the imputed motive did not exist, *i. e.*, that he was denying a settlement because he had recently learned that property was not bequeathed as he supposed. In such case he may show similar statements before he learned how it was willed, when no such motive could have operated. *Herrick* v. *Smith*, 13 Hun, 446; *People* v. *Finnegan*, 1 Park. Cr., 150-1.

*b.* Where there is evidence in contradiction, tending to show that the account of the transaction given by the witness is a fabrication of a late date, it may be shown that the same account was given by him before its ultimate effect and operation, arising from a change of circumstances could have been foreseen. *People* v. *Finnegan*, 1 Park., 151.

The evidence covered by the objections in the case at bar did not fall within either exception.

Where corroboration is sought from prior acts rather than statements of the witness, the proof is clearly incompetent. The precise point involved here was decided in *Savings Bank* v. *Shakman*, 30 Wis., 333, where it was held that acts or omissions of a witness, forming no part of the *res gestœ*, are not admissible to confirm his testimony.

*La Mott W. Rhodes*, district attorney, for the people respondents.

MILLER, J.—The defendants were convicted of participation in the publication of a libel against one Sheary. The alleged libelous article was published in a newspaper printed by a corporation, with which all the defendants were connected in some capacity. Upon the trial, proof was given to establish that the libelous article in question was written by one Lowery; that it was published in the first edition of the newspaper in question; that upon its perusal immediately after the printing of the newspaper, a question was made as to the truth of the charges contained in the article published, which related to the disbursements of money for street clean-

ing purposes in connection with the comptroller's office in the city of Troy, and thereupon said Lowery and one Hennessey were sent to the comptroller's office to ascertain if the charges in the printed article were true. They reported that the same were false, and an article was written by Hennessey, in season for the second edition, containing a retraction, which defendants declined to publish, and issued the second edition, which contained said libelous article as previously published.

The testimony of Hennessey and Lowery, in regard to their going to the comptroller's office, was contradicted by the defendants, and each of them denied any knowledge of the libelous article until after it had been published in the second edition of the newspaper. The prosecution then called as a witness one De Freest, a clerk in the comptroller's office, who testified that, between three and four o'clock on the day in question, Hennessey and Lowery came to the office of the comptroller and looked over the books. The evidence was confined to this single fact. The defendant's counsel objected to the evidence upon the ground, among others, that it was not competent for the people to corroborate the alleged truthfulness of the witnesses, who had previously testified as to the same fact, by proving that a fact which they stated to have occurred in the absence of the defendants, or either of them, was true. The objection was overruled, and the defendants separately excepted to the ruling of the judge.

We think there was no error in the admission of the evidence objected to. Hennessey had sworn that the defendants, with the exception of Sherman, held a meeting after he and Lowery had been to the comptroller's office, and notified them that the printed article was untrue. The testimony objected to and introduced corroborated Hennessey's evidence. The evidence previously introduced tended to establish that all the defendants, with the exception of Sherman, had knowledge of the sending of Lowery and Hennessey to the comptroller's office; that they had made an examina-

tion there, and had found the article in question to be false; that a retraction was prepared, and the publication thereof refused, and the libelous article republished. The testimony, therefore, of De Freest strongly sustained the other evidence introduced. It related to the principal question involved, whether the defendants had knowledge of, or participated in, the alleged libelous publication. It was a corroboration in regard to the main issue involved upon the trial. Although the facts testified to by De Freest had been previously proven, yet, as it was material and bore upon the whole case, it was competent to establish by another witness what had already been proved. It added to the weight of the testimony introduced as to a very important fact, and was entirely competent additional proof bearing upon the issue presented. Even if it be regarded as corroborating another witness, as it related to the main question of the defendant's guilt, it was entirely relevant. As Lowery was an accomplice, and on his evidence alone no conviction could be had, the corroboration was proper and the evidence material to prove that defendants had knowledge and notice as to the falsity of the charges made.

The authorities cited by the learned counsel for the appellants, to sustain his position that the evidence was inadmissible, are not, we think, in point. The visit to the comptroller's office was a very material fact which bore directly upon the innocence or guilt of the defendants. It relates to the motive of the defendants, and the question of malice, which was involved upon the trial. If the defendants knew that the charges made were false and untrue, before the publication of the second edition of the newspaper, and had an opportunity to correct the same, proof of such knowledge was material and important. The time of the visit was important, and the testimony was limited mainly to that, and might well have been proved by any number of witnesses.

In the case of *People* v. *Haynes*, 55 Barb., 450, which is relied on, the evidence held to be incompetent related to a collateral matter, which had no direct bearing upon the

charges made, while the testimony here was direct, and connected with the *gravamen* of the offense alleged.

The other authorities cited are also inapplicable. If the testimony here can be regarded as a corroboration of an accomplice, it related to a fact which tended to fix the guilt upon the persons charged with the offense ; but, as we have seen, it was otherwise admissible as relating to the main issue involved, and as constituting a part of the *res gestæ.*

We have examined the other questions raised by the appellant's counsel, and find no ground for holding that any error was committed by the court in its rulings in regard to them. They are sufficiently considered, so far as material, in the opinion of the general term.

The judgment and conviction was right and should be affirmed.

All concur.