THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL KAMPSHOFF, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDWARD JORDAN, Appellant.

Fourth Department, July 12, 1976

326

*Leonard Berkowitz* for Michael Kampshoff, appellant.

*Nathaniel A. Barrell* for Edward Jordan, appellant.

*Edward C. Cosgrove, District Attorney (Judith Manzella* of counsel), for respondent.

MARSH, P.J. Defendants appeal from judgments of conviction rendered following a jury verdict finding defendant Kampshoff guilty of felony murder, second degree burglary and second degree robbery and defendant Jordan guilty of intentional murder, felony murder, second degree burglary and second degree robbery. The first count of the indictment of defendant Kampshoff charging intentional murder was not submitted to the jury. Defendant Kampshoff moved for severance and a separate trial prior to trial which was denied.

On February 17, 1973 Mrs. Gladys Kampshoff, age 71, was found by a neighbor dead in the garage attached to the home occupied by her alone at 2797 Tonawanda Creek Road, Amherst, Erie County. Her body was partially frozen. A make-

shift blindfold and mouth gag were found taped to her face and the body was in a prone position next to the left rear wheel of her automobile. A board was lying partially on her head and a large monkey wrench was lying over one shoulder. While looking for her the neighbor saw the telephone off the hook and found all doors allowing access to the house secured and locked except a garage car door. The television set was on. Telephone company records showed that the receiver was taken off the hook sometime between 3:30 and 4:00 P.M. on February 16. The county medical examiner was called to Mrs. Kampshoff's residence February 17 and he confirmed the earlier finding of the location and appearance of the victim's body. The cloth binding around the deceased's head was held by an unusual tape used in surgery for binding the closures in operations. He stated that all four extremities of the victim were frozen. There was evidence of bleeding from the rear of the skull and black and blue marks and reddish marks appeared around her left eye and left temporal region. There were a linear wound across and underneath the angle of her jaw and contusions and abrasions to her forehead. There were a superficial laceration in the neck area and two stab wounds on the left side of the chest. The victim's breast bone was fractured and there were many broken ribs. The victim had a tear in the mesentary approximately four inches in length. The cause of death was given as due to multiple abdominal and chest trauma with hemorrhage, multiple trauma to the head and penetrating stab wounds of the left pleural cavity and lung.

The principal narrative of the events leading up to and surrounding the alleged crimes was given by Warren Strodel, an admitted accomplice of defendants who had been granted immunity. It was his testimony that on February 12 he met with the two defendants to discuss plans for the robbery. Defendant Kampshoff told him that he believed his aunt, Mrs. Kampshoff, had between $50,000 and $75,000 in her home. Kampshoff did not want his aunt to see his face. He wanted her subdued as gently as possible, overpowered, taken to another room and tied, so that Kampshoff could look for the money. In pursuance of the plan, on February 16 Strodel told Kampshoff to pick up defendant Jordan and make sure that he had tape and gloves. Kampshoff left and returned with Jordan, and Strodel asked Kampshoff if he had gotten the tape and Kampshoff said he had. Kampshoff and Jordan got

into a beige two-door Cadillac with Strodel. Jordan had an attaché case to use as a salesman's prop to assist in gaining access to Mrs. Kampshoff's home and Kampshoff had a gym bag. They also had a pellet gun and darts. Jordan had a bulky light sweater on and Kampshoff a brown coat. Both defendants had shoulder-length hair. They observed children playing hockey across the street from Mrs. Kampshoff's home, and passed the house once. It was then between 2:00 and 2:30 P.M. One of the defendants stated that the presence of the children would make no difference and they approached the house a second time and stopped. Jordan got out of the car, Kampshoff gave him some tape and he and Kampshoff drove ahead a distance. They saw Jordan ring the bell, wait a few moments and then walk around to where the garage doors were located. They then drove around and when they returned they did not see Jordan outside the house. Ten minutes from the time they dropped Jordan off they returned to the house and Strodel let Kampshoff off. Kampshoff took the gym bag with him and he saw him go around the corner of the house where the garage doors were located. He then drove around and passed the house every five minutes until 25 minutes had elapsed. At that time he pulled up in front of the house and, as a prearranged signal discussed several times with both defendants he fired a .22 caliber dart with blue feathers at a large window in the corner of the house. He then drove on, turned around and stopped just past the house. Both defendants, Kampshoff with a brown gym bag and Jordan with an attaché case, then got back into the car. Jordan had a knife with him. Kampshoff got in first and said, "I think she's dead. He did a number on her." Strodel asked Jordan why he hit her and Jordan said that she wouldn't be quiet. He cut the victim to scare her. Kampshoff said that his aunt was lying on the floor of the garage and looked in pretty bad shape, and that if she was not dead already she probably would freeze to death. He left the phone off the hook because a busy signal would not be as suspicious as a failure to answer. The money they expected wasn't there and upon returning to Strodel's home they went through the contents of the gym bag and found that contained papers, music sheets, bills, canceled checks, some government checks and $40 in cash. The money was divided and Strodel suggested that they burn the bag and its contents.

On cross-examination Strodel admitted having told different stories to the police a number of times, denying his own

involvement and exculpating Kampshoff and Jordan. He admitted to disorderly conduct convictions, that he had stolen a car and that he had sought immunity to avoid punishment for his own participation in the crime. He stated that he was on drugs in 1973, that he had been hospitalized three days for an overdose of thorazine, that he had attended regularly an institution where people are treated for psychotic problems and was treated by a psychiatrist, that it was partially true that the medications and drugs he was taking put him in a land of fantasy and removed him from the reality of life and that as a result of problems with a girl friend he had kicked and punched walls. A defense request to place Strodel's medical records in evidence was denied by the court.

As a part of their case defendants sought to introduce the testimony of Dr. Schutkeker, a psychiatrist. Without the presence of the jury he stated that he had heard Strodel's testimony and that the questions and answers gave him excellent insight into Strodel without the necessity of a direct examination. His diagnosis of Strodel was that he had a psychopathic personality, a severe character defect and was insincere and untruthful about the reasons he gave for treatments he had received. He further stated that Strodel had denied and concealed the reason why he saw a psychiatrist and in his opinion he lied on the stand. The defense motion to allow the psychiatrist to testify before the jury was denied.

There can be no question but that Strodel's testimony assumed paramount importance at the trial and defense counsel were entitled to exercise wide latitude in attacking it.

Initially, it is abundantly clear that whether or not a particular witness is telling the truth is a conclusion to be drawn solely by the jury, and an opinion which is exclusively within their province to render *(People v Williams,* 6 NY2d 18, 23). Thus, under no circumstance could Dr. Schutkeker testify that it was his opinion that Warren Strodel lied on the stand. "Opinion evidence may not be received as to a matter upon which the jury can make an adequate judgment." *(People v Graydon,* 43 AD2d 842, 843.) The defense however urge that the medical records and psychiatric testimony were essential to their effort to discredit the testimony of Strodel.

The jury is entitled to be made aware that there is "something mentally wrong" with a witness and that a witness may not be "normal" *(People v Rensing,* 14 NY2d 210). This is to allow the jury to assess and evaluate the testimony in light of

these facts, and to avoid having them accept such testimony as the statement of a normal individual. *(People v Rensing, supra.)*

Defense counsel were permitted to cross-examine Strodel vigorously and at length concerning his use of drugs, his attendance at the Monsignor Carr Institute, his attendance at the Meyer Hospital outpatient psychiatric ward, his contacts with psychiatrists, his episode of violence and machete-throwing, his threatening suicide, and his doubting his own sanity on occasion. The fact that he was not a "normal" individual was clearly put before the jury by the defense cross-examination.

It would appear abundantly clear that sufficient evidence was produced on cross-examination to enable the jury to evaluate Strodel's testimony in light of the fact that there was "something mentally wrong" with the witness.

There is no claim however that Strodel's ability to perceive or recollect the events of February 16, 1973 was impaired by his past history of mental disorders. Credibility was the key issue for the jury's consideration and in view of the extended cross-examination permitted and the history developed, the jury was fully apprised of the factors in Strodel's background to enable them to make a sound judgment of his credibility, as properly was their role, and it was not error to refuse to accept the testimony of the psychiatrist.

The defense further urges that there was insufficient corroboration of the accomplice-witness Strodel as required by CPL 60.22 (subd 1).

To determine whether the evidence corroborating the testimony of the accomplice is sufficient to submit the question of defendant's guilt to the jury, the court should be satisfied that there is some corroborative evidence fairly tending to connect the defendant with the commission of the crime *(People v Morhouse,* 21 NY2d 66; *People v Fiore,* 12 NY2d 188; *People v Nitzberg,* 287 NY 183; *People v Kress,* 284 NY 452; *People v Elliott,* 106 NY 288; *People v Hooghkerk,* 96 NY 149). The required corroboration may be either direct or circumstantial *(People v Mullens,* 292 NY 408; *People v Guernsey,* 24 AD2d 811), and it is sufficient "if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth *(People v Dixon,* 231 NY 111, 116).

The corroborative evidence need not lead exclusively to the

inference of the defendant's guilt *(People v Morhouse, supra; People v Chamberlain,* 38 AD2d 306). And the independent evidence need not exclude to a moral certainty every hypothesis but that of wrongdoing. "The test is less rigid." *(People v Kohut,* 30 NY2d 183, 194.) As the Court of Appeals has noted: "Matters in themselves of seeming indifference * * * may so harmonize with the accomplice's narrative as to have a tendency to furnish the necessary connection between defendant and the crime" *(People v Dixon, supra,* pp 116-117).

, At a *Wade* hearing following which the court denied suppression and on the trial Philip Heimiller, age 14, testified that he was playing hockey on February 16 on a creek across from Mrs. Kampshoff's house about 130 feet away when at about 2:15 or 2:30 P.M. he saw a car stop and a man with long brown hair, wearing a three-quarter length brown coat and carrying a brown gym bag exit from the car and walk to Mrs. Kampshoff's driveway. About 15 to 30 minutes later he saw the same man run around the same car and enter it. He saw the man between 15 and 20 seconds the first time and about 10 seconds the second time. He identified the defendant Kampshoff as the man he saw and a burned gym bag produced by the People as looking like the bag the man was carrying. On cross-examination at the *Wade* hearing it was established that the witness first identified the defendant from a group of seven or eight pictures without at the time having any prior knowledge as to who the parties were or without any suggestion from the police or any other source. Later he identified defendant from a news telecast which his mother was asked by the police to have him view. At that time he knew that defendant, a suspect, was going to appear. Subsequent to his initial identification on the telecast he again viewed the same news clip. While under the rule of *People v Rosario* (9 NY2d 286), the court improperly refused defendant's request for the production of police memoranda covering all interviews with the witness, the witness was subjected to extensive cross-examination which was not curtailed by the court. The jury was accorded a full opportunity to judge the weight and effect of the testimony that he gave, which certainly tended to corroborate the testimony of the accomplice Strodel as to the identity of defendant Kampshoff.

Cynthia Dibble, age 19, was also skating on the creek. She observed a car going slowly on the road at five-minute intervals three times. The third time she saw the car it stopped, a

person whom she could not identify, but having hair the same as Kampshoff's and basically of the same color, came running down the road and got in the car. The car was a tannish color and looked like the car shown in photographs of the Strodel car. The car then took off. The last time she saw it was between 3:00 and 3:30 P.M.

The unusual blenderm surgical tape used to bind the cloth around the deceased's head and which was available for acquisition at only four medical supply outlets in Buffalo was found to be similar to tape taken from the residence of defendant Kampshoff. Also a pack of Robert Mason Insurance Company matches was found in the home of the victim as well as in the car registered to Strodel's father, used by the defendants, and at the scene of a fire discovered about 8:15 P.M. on February 16. At the fire the police found paper, bills, music sheets, a brown satchel and a bill bearing the name Kampshoff, all partially burned. The location of the fire was near the defendant Kampshoff's home and almost next door to Strodel's girl friend, and Strodel chided Kampshoff for picking such a location for the fire. Further corroboration was given by the testimony of police officers that they observed a hole in a window in the victim's home and a feathered metal tipped dart in the shrubbery on the ground below the window. Finally, corroboration was supplied by the testimony of the witness Easton, narrating a scheme proposed by defendant Kampshoff similar to that eventually carried out but abandoned at the time with the statement by Kampshoff that he intended to get the money when things cooled off. Most significant also was the identification of three latent palm prints located on the side of the automobile in the victim's garage as belonging to the defendant Jordan.

The defense asserts error in permitting the witness Easton to testify regarding the prior burglary attempt at the Kampshoff residence. Easton testified that by prearrangement he and defendant Kampshoff went to Gladys Kampshoff's residence about midnight on March 11, 1972. Kampshoff told him that Mrs. Kampshoff was his aunt and had about $75,000 in the house. Easton was to enter the house and detain her in another part of the house, possibly a closet while Kampshoff went through the house to get the money. Kampshoff didn't want his aunt hurt, just taken out of the way where she wouldn't see him. When they arrived at the house they had a cap and ski mask and wire cutters. Easton cut the telephone

wire but they had an argument over who was going to wear the ski mask. At that moment lights went on in the house and they both fled the scene. Kampshoff told him that he firmly believed that the money was in the house and he intended to return after things cooled off following their initial attempt. Easton testified under a grant of immunity.

The general rule governing the admissibility of prior uncharged crimes was set forth in *People v Molineux* (168 NY 264, 291): "The general rule of evidence applicable to criminal trials is that the state cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for a separate punishment, or as aiding the proofs that he is guilty of the crime charged." But *Molineux* also noted five well-known exceptions to the general rule, writing (p 293): "The exceptions to the rule cannot be stated with categorical precision. Generally speaking, evidence of other crimes is competent to prove the specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial."

Also instructive in this regard is *People v McKinney* (24 NY2d 180, 184) where the Court of Appeals stated: "The basic rule concerning use of evidence of uncharged crimes and offenses is that such evidence is inadmissible if offered for no purpose other than to raise an inference that a defendant is of a criminal disposition and, therefore, likely to have committed the crime charged. *(People v. Goldstein,* 295 N.Y. 61.) The rules governing the admissibility of uncharged crimes represent a 'balance between the probative value of such proof and the danger of prejudice which it represents to an accused.' *(People v. Schwartzman,* 24 N Y 2d 241; *People v. Dales,* 309 N.Y. 97; see, also, *People v. Molineux,* 168 N.Y. 264, 291-294; McCormick, Evidence [1954], § 157; Fisch, New York Evidence [1959], § 209.) Thus, evidence of other crimes is admissible if directly probative of the crime charged for in that event the evidence is relevant for a purpose other than to show a criminal disposition and its probative value is deemed to outweigh the danger of prejudice."

A recent Court of Appeals decision *(People v Jackson,* 39 NY2d 64) dealt with the admissibility of evidence of prior uncharged narcotics sales for the purpose of showing that the

defendant and another were "acting in concert." The court (p 68) found that "While 'acting in concert' is not one of the five *Molineux* exceptions, it has been said that those categories are merely illustrative, not exclusive *(People v Calvano,* 30 NY2d 199, 205-206; Richardson, Evidence [Prince—10th ed], § 170, p 140)." Thus it appears that "when the prior activity is directly probative of the crime charged, the probative value is deemed to outweigh the danger of prejudice" and evidence of the prior uncharged crime will be admissible *(People v Jackson, supra,* p 68; *People v McKinney, supra).*

The People urge that Easton's testimony shows a common scheme or plan to burglarize Gladys Kampshoff's residence, and that such scheme or plan serves to identify Kampshoff as the perpetrator of the charged crime. To bring it within the exception, there must be evidence of a system between the offense on trial and the one sought to be introduced *(People v Molineux, supra).* "They must be connected as parts of a general and composite plan or scheme, or they must be so related to each other as to show a common motive or intent running through both." *(People v Molineux, supra,* p 305.) And generally, "when several similar crimes occur near each other, either in time or locality * * * it is relevant to show that the accused, being present at one of them, was present at the other *if the crimes seem to be connected." (People v Molineux, supra,* pp 305-306.)

The similarities between the crime charged and the crime sought to be introduced establish a strong connection between the two. In fact the connection is so strong that it appears to be somewhat of a misnomer to call it a "common" plan or scheme. The prior uncharged crime was in reality a frustrated attempt to commit the same crime as presently charged. The attempt was made against the same victim, using the same general plan, for the same purpose, namely, to steal $75,000 that Mrs. Kampshoff was alleged to have hidden on the premises. The scheme or plan involved, here as conceived by Kampshoff, and which he told Easton he would consummate after things cooled off following the first attempt, was to rob Mrs. Kampshoff of a substantial sum of money, and the March, 1972 episode related by Easton was an individual manifestation of the over-all plan. As such, the testimony was properly admitted pursuant to the common scheme or plan exception *(People v Molineux, supra; People v Fiore,* 34 NY2d 81).

The evidence adduced was clearly sufficient to connect the defendants with the commission of the crimes in compliance with the requirements of CPL 60.22 (subd 1).

Additional testimony with reference to identification of the defendants was given by two children, Ronald Heimiller and Kevin Spoth. *Wade* hearings were held at which both testified and the court in each case denied suppression. Both were with Philip Heimiller playing hockey across from the victim's residence on February 16. Ronald, age 12, testified at the *Wade* hearing to seeing a car stopped on the road, and a man getting out carrying a brown plastic gym bag, going into the Kampshoff driveway, and returning in 15 to 20 minutes. He identified the defendant Kampshoff as the man he saw. On cross-examination he stated that he saw the side of the man's face for a couple of seconds on the first occasion and no part of his face the second time. He first identified defendant when he saw him on TV after he had been told by his mother that the police had called and said that the person to be shown was a suspect in the case. He then said that the man in the filmclip looked like the man he saw. He gave similar testimony at the trial stating that he was not sure that Kampshoff was the same man he saw on February 16.

Kevin Spoth, age 15, was with the other two boys and at the *Wade* hearing he testified that he saw a person in the Kampshoff driveway enter the house through the garage door. His observation time was 10 seconds to 15 seconds and he identified defendant Jordan as the man he saw. He first identified Jordan after seeing the filmclip at which time he knew from the police that Jordan was a suspect in the murder. He never saw a frontal view of the man at the scene and saw a sideview for only a second. The defense moved for the production of police memoranda dealing with the testimony given which the court denied.

Spoth gave similar testimony on the trial, stating that at no time did he say that defendant Jordan was the man he saw, only that he looked like him.

It would clearly appear that the TV photographic identification procedure made use of by the police with reference to each of the witnesses Ronald Heimiller and Kevin Spoth "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification". *(Simmons v United States,* 390 US 377, 384; *People v Logan,* 25 NY2d 184, cert den 396 US 1020; *People v Ballott,* 20 NY2d 600; *People v*

*Brown,* 20 NY2d 238, mod 20 NY2d 801, cert den 390 US 928.) This would be particularly true in view of the witnesses' youth and the admittedly scant opportunity afforded them to make observations of the persons at the scene thus making less likely an independent source for their identification. While the trial court instructed the jury to consider the suggestiveness of the TV viewing relative to the witnesses' identification testimony, their identification testimony should have been suppressed at the trial. However, while the court erred in receiving identification testimony of these witnesses, a review of its content especially in the light of cross-examination indicates an indefiniteness, confusion and lack of certainty which entitles it to little if any probative value. Under all the circumstances demonstrated in the record and in view of the character of the witnesses' testimony it would appear that there is no reasonable possibility that the error of the court in not suppressing the testimony might have contributed to defendants' convictions and it was thus harmless beyond a reasonable doubt *(Chapman v California,* 386 US 18, rehearing den 386 US 987; *Fahy v Connecticut,* 375 US 85).

Defendant Kamphsoff urges reversible error in the court's denial of his motion for a separate trial. Kampshoff asserts that there was a substantial difference in the amount of evidence which People had with respect to defendant Jordan's guilt and the relatively meager demonstrative evidence against himself, and that such difference required a separate trial. The prosecution denies that the disparity in the weight of the evidence against each defendant was substantial enough to warrant a severance, and instead urges that the trial court properly exercised its discretion in denying the request for a separate trial under CPL 200.40 (subd 1). "The test is whether a separate trial will assist or impede the proper administration of justice and secure to the accused the right of a fair trial." *(People v Fisher,* 249 NY 419, 424.)

The Court of Appeals addressed the issue of severance in *People v Bornholdt* (33 NY2d 75, cert den *sub nom. Victory v New York,* 416 US 905). There the court stated (p 87): "The governing principles may be quickly set out. A motion for a separate trial is directed to the sound discretion of the trial court, subject to review only for an abuse thereof. *(People v. Owens,* 22 N Y 2d 93; see, also, *Opper v. United States,* 348 U.S. 84, 95; *United States v. Echeles,* 352 F. 2d 892 [7th Cir.].) Where proof against the defendants is supplied by the same

evidence, only the most cogent reasons warrant a severance *(United States v. Kahn,* 381 F. 2d 824, 839 [7th Cir.], cert. den. 389 U.S. 1015). But upon a proper showing of need for a codefendant's testimony, it may be an abuse of discretion to deny severance. *(People v. Owens, supra,* at p. 98; see *United States v. Gleason,* 259 F. Supp. 282 [S.D., N.Y.].) However, a proper showing of need imports that the movant clearly show what the codefendant would testify to and that such testimony would tend to exculpate the movant. *(Byrd v. Wainwright,* 428 F. 2d 1017, 1020 [5th Cir.].) Moreover, the court is not required to sever where the possibility of the codefendant's testifying is merely colorable or speculative. *(Byrd v. Wainwright, supra,* at p. 1022; *United States v. Kahn, supra,* at p. 841.) Finally, the motion must be timely. *(People v. Owens, supra,* at p. 98.)"

Applying these principles to the instant case it appears that the trial court's refusal to grant the severance did not amount to an abuse of discretion. Clearly the accomplice testimony of Warren Strodel was the critical evidence introduced against both Kampshoff and Jordan. The palm print evidence introduced against Jordan served to place him at the scene of the crime and to corroborate Strodel's testimony. But it cannot be said that the palm print evidence served to create such a great disparity in the evidence, weighted against defendant Jordan, that a separate trial was required. Kampshoff was placed at the scene of the crime by Philip Heimiller's in-court identification testimony, which also corroborated the testimony of Strodel. Even though it can be argued that the palm prints were "better evidence" than Heimiller's identification testimony, it is clear that the claimed disparity in evidence does not exist. The same evidence, Strodel's testimony, implicated both Kampshoff and Jordan. Under these circumstances, "only the most cogent reasons warrant a severance" *(People v Bornholdt, supra* p 87).

The evidence against Kampshoff independent of Strodel's testimony could not be called "very limited". There was enough independent evidence to tend to connect him to the commission of the crime. There was not such a substantial difference in the weight and quantum of the evidence admitted against Jordan and inadmissible against Kampshoff so as to mandate a separate trial. In addition, the record does not support the conclusion that the court's instructions were vague and indefinite on the question of which evidence was

admissible against which defendant (cf. *People v Pilon,* 30 AD2d 365).

Kampshoff also claims that he was prejudiced by the fact that without a separate trial he was denied the right to call defendant Jordan to the stand to testify on his behalf. In order for a defendant to be entitled to a separate trial on the ground that his codefendant's testimony is necessary to his defense, there must be a showing of intention to call the defendant as a witness and a need to do so; the mere statement of intention is hardly sufficient unless the circumstances indicate sincerity of intention and reasonable need. *(People v Owens,* 22 NY2d 93, 98; *People v Bornholdt, supra.)* A proper showing of need imports "that the movant clearly show what the codefendant would testify to and that such testimony would tend to exculpate the movant" *(People v Bornholdt, supra,* p 87). Kampshoff has stated only that Jordan's testimony may very well have been able to exculpate him. This showing of need is insufficient to require a severance.

Defendant Kampshoff argues that the trial court committed error in refusing to charge the affirmative defense to felony murder (Penal Law, § 125.25, subd 3). In the alternative, he contends that subdivision 3 of section 125.25 of the Penal Law is no longer constitutional in light of the United States Supreme Court decision in *Mullaney v Wilbur* (421 US 684). The People urge in opposition that the evidence disproved an essential element of the affirmative defense to felony murder, and that, therefore, the trial court properly refused to charge the defense. The prosecution asserts also that the constitutionality of subdivision 3 of section 125.25 of the Penal Law is unimpaired by *Mullaney v Wilbur (supra).*

Subdivision 3 of section 125.25 of the Penal Law sets forth the affirmative defense to felony murder. It is an affirmative defense that the defendant:

"(a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and

"(b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law abiding persons; and

"(c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

"(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

The purpose of this affirmative defense is to afford a defendant an opportunity to show "that he not only had nothing to do with the killing itself but was unarmed and had no idea that any of his confederates was armed or intended to engage in any conduct dangerous to life" (Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law, § 125.25, p 401; see, also, *People v Bornholdt,* 33 NY2d 75, 83-84).

Defendant Kampshoff contends that the record contains sufficient evidence to require the submission of the affirmative defense to the jury. Kampshoff's claim is without merit. The record shows that Kampshoff knew that the victim would freeze to death if she was not already dead. To insure that no one would come to her aid with any dispatch he apparently removed the telephone from the hook. This conduct amounted to aiding the commission of the homicide by shutting off any reasonable possibility that Mrs. Kampshoff would be discovered prior to her death. Hence, the affirmative defense properly was not charged.

In addition, there is a further reason why the evidence fails to support Kampshoff's claim. The record shows that Kampshoff instructed Jordan to subdue his aunt gently. Kampshoff was obviously aware that she was an elderly woman, in fact 71 years of age. By instructing Jordan to engage in such conduct, i.e., subduing or overpowering an elderly woman for purposes of burglarizing her house, Kampshoff reasonably must have been aware of the risk of serious physical injury that such instructions might engender. As such, the record does not support the affirmative defense (Penal Law, § 125.25, subd 3, par [d]).

Kampshoff also argues that subdivision 3 of section 125.25 of the Penal Law is unconstitutional in light of *Mullaney v Wilbur* (421 US 684, *supra).* Kampshoff urges that *Mullaney* requires that the prosecution bear the burden of proof beyond a reasonable doubt to negative the affirmative defense to felony murder. Clearly this argument must fail.

*Mullaney v Wilbur (supra)* stands for the proposition that it is constitutionally impermissible to require a defendant to disprove an element of the crime charged against him. The prosecution is required to bear the burden of proof beyond a reasonable doubt for all elements of the offense. In the instant

case the offense charged is felony murder. The affirmative defense to felony murder does not encompass any of the same elements as does the crime of felony murder. Thus *Mullaney* does not dictate that subdivision 3 of section 125.25 of the Penal Law be held unconstitutional (see *People v Patterson,* 39 NY2d 288).

Since the record does not support Kampshoff's claim that he was entitled to have the affirmative defense charged, and since *Mullaney v Wilbur (supra)* does not require that the affirmative defense be held unconstitutional, the lower court correctly refused to charge it.

Finally, defendants claim that the indictment was fatally defective in that the Grand Jury returning it was illegally constituted. The prosecution asserts that the motion to dismiss the indictment was untimely and that, therefore, defendants have waived any objection that they might have made to the constitution of the Grand Jury.

Defendants were indicted on August 3, 1973 and both pleaded not guilty on August 6, 1973. Both moved to dismiss the indictment on the ground that the Grand Jury was illegally constituted; Jordan on August 15, 1974 and Kampshoff on September 16, 1974 (CPL 210.20, subd 1, par [c]; 210.35, subd 1). Clearly both motions were not timely made under the 30-day rule for pretrial motions applicable at that time (CPL 210.20, subd 2).

The failure to object to the composition of the Grand Jury within the prescribed time period for such pretrial motions constitutes a waiver of the right to object *(Matter of Paciona v Marshall,* 45 AD2d 462, affd 35 NY2d 289; see *Francis v Henderson,* 425 US 536; *Davis v United States,* 411 US 233). In addition there has been no showing of prejudice to the defendants-appellants from the composition of the Grand Jury and "no cause is shown that the interest of justice warrants an extension of [defendants'] time to challenge the composition of the Grand Jury." *(Matter of Paciona v Marshall,* 45 AD2d 462, 465, *supra.)* Kampshoff's argument that his indigency prevented him from seeking to challenge the composition of the Grand Jury goes to the issue of his ability to effectively marshall proof that the Grand Jury was improperly constituted. It cannot be said that his indigency prevented him from making the motion itself. Therefore, it appears that *Paciona (supra)* is applicable here, and defendants-appellants' contention must be rejected.

No other allegation of error warranting reversal finds support in the record. The evidence amply supports the jury's verdicts and the judgment of conviction as to each defendant should be affirmed.

MOULE, SIMONS, GOLDMAN and WITMER, JJ., concur.

Judgments unanimously affirmed.