■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JEROME DUDLEY, Appellant.—Judgment, Supreme Court, New York County (Jerome Hornblass, J.), rendered February 1, 1989, convicting defendant of robbery in the first degree (Penal Law § 160.15) and sentencing him to an indeterminate term of imprisonment of 2½ to 7½ years, reversed, on the law and the facts and as a matter of discretion in the interest of justice, and the case remanded for a new trial.

The People's case rested solely upon the eyewitness testimony of the complainant who had a long history of psychiatric illness. Thus, the trial court should have permitted the defense to offer expert testimony as to the witness's medical

condition and treatment, and as to the effect, if any, his condition had upon his capacity at the time of the incident. *(People v Parks,* 41 NY2d 36 [1976]; *People v Freshley,* 87 AD2d 104 [1st Dept 1982].)

Jerome Dudley and codefendants Jorge Varona, Richard Cespi and Lionel Gray were jointly tried and convicted for the October 19, 1987 robbery at knifepoint of 40-year-old Leroy Chow. The incident occurred at approximately 2:30 A.M. as Chow exited the Union Street subway station at Third Avenue and Fourteenth Street in Manhattan. Chow, who has a long history of psychiatric illness, left his home in Brooklyn and was heading for Beth Israel Hospital where he hoped to receive medication for the anxiety which he was experiencing.

As Chow approached the stairway leading to the street, he observed a group of some 14 people who appeared to be selling drugs in the area of the token booth. On the stairway were the four men, one of whom Chow identified as the defendant. They asked Chow if he wanted to buy "smoke" and Chow replied, "No". One of the men held a razor blade to Chow's face while the other three grabbed him, removed his hearing aid and took $20 from him.

Chow escaped, avoiding a fifth person at the top of the stairs, and called "911" from a nearby telephone. Within a few minutes police arrived and arrested the four defendants in the vicinity after they were identified by Chow. A $20 bill, folded in a manner similar to the one Chow said was taken from him, was discovered in Varona's pocket and a razor blade was found on Cespi.

During pretrial hearings and again during trial, the defendants moved for the introduction in evidence of expert medical testimony concerning the nature of the complainant's mental condition at the time of the incident and the effect that that condition might have had on Chow's ability to perceive and recall, as well as on his susceptibility to suggestion. These motions were denied. The defendants also moved to introduce Chow's medical records. The court ruled that the defendants could use the medical records to cross-examine Chow and otherwise denied the application. Later it ruled that the defense could apply to introduce particular portions of the medical records after cross-examination of Chow. However, the defendants never offered any portion of the records for admission in evidence.

The following evidence was elicited concerning Chow's psychiatric history. Chow first underwent psychiatric treatment

at age 13 when he was hospitalized for 20 months. This was followed by five or six hospitalizations for "nervous breakdowns". One of these "nervous breakdowns" occurred in 1980 following what may have been an attempted burglary of his apartment. When not hospitalized, Chow received psychiatric care as an outpatient and was treated with tranquilizing medications such as "Haldol" and "Cogentin". Chow had been an outpatient at South Beach Psychiatric Center for 13 years and at Beth Israel Hospital for 15 years. When, as on the night before the incident, the level of medication in his system fell, Chow became agitated and would return to the hospital for additional medication.

In September 1987, approximately one month prior to the incident, Chow attempted suicide, claiming to have heard voices telling him to hurt himself. During this hospitalization Chow's medication was discontinued due to severe ulcers. Chow was released from the hospital, without medication, just two weeks prior to this incident.

Following the robbery, a tranquilizer was administered to Chow at Beth Israel Hospital and he was released. He returned to the hospital several times during that month for treatment. In November of 1987, Chow called "911" complaining of stomach pain. He was taken by ambulance to Coney Island Hospital, but later transferred to Kingsborough Psychiatric Center. During that same month Chow also was admitted to South Beach Psychiatric Center after having taken an overdose of "Haldol".

Chow was hospitalized for yet another "nervous breakdown" in January of 1988. At the time of trial, in May of 1988, he was receiving psychiatric treatment.

Since the People's case turned solely upon the eyewitness testimony of Mr. Chow, the trial court should have permitted the defendant to offer testimony of psychiatric experts to explain Chow's medical condition and treatment as well as the effect, if any, they may have had upon Chow's capacity at the time of the incident. *(People v Parks,* 41 NY2d 36, *supra; People v Freshley,* 87 AD2d 104, *supra.)*

Resolution of the question of whether or not Chow was competent to testify under oath was, of course, the exclusive responsibility of the trial court, subject to limited appellate review. (CPL 60.20; *People v Parks,* 41 NY2d 36, 46, *supra.)* However, the determination as to Chow's credibility and the weight to be given his testimony was the province of the jury. In this regard "[t]he testimony of specialists or others with

particular knowledge of the witness' mental or physical condition may provide invaluable assistance to the jury." *(People v Parks,* 41 NY2d, *supra,* at 47; *see also, People v Rensing,* 14 NY2d 210 [1964]; *People v Freshley,* 87 AD2d, *supra,* at 109.)

In *People v Parks (supra),* the Court of Appeals held that testimony by the retarded complainant's teacher as to the child's intelligence quotient and mental development was properly admitted. The Court of Appeals reasoned that this evidence provided the jury with an objective analytical framework for evaluating the complainant's testimony, stating: "The jury * * * can, in discharge of its appropriate function, find, as a matter of fact, that the testimony of the witness, truthful or not, was too weak to be given any credit. * * * The finding by the jury is not that the witness' testimony is false, but that the witness is, in the mind of the jury, so infirm that the testimony cannot be evaluated in an intelligent fashion * * *. In order that the jury may accurately appreciate the nature of the witness' infirmity, the trial court, in its sound discretion, may permit experts or others with personal knowledge of the witness to explain and describe the witness' condition." (41 NY2d, *supra,* at 47.)

In *People v Freshley (supra),* this court reversed a robbery conviction where, although the trial court permitted the People to call a school psychologist to testify concerning the complaining witness's mental retardation, it denied a defense motion to inspect the psychologist's records relating to the complainant. In *Freshley (supra,* at 109-110), relying upon *People v Parks (supra),* we articulated the conditions which must exist before such an expert's or interested observer's testimony may be admitted: "(1) it must be shown that the complainant or a crucial witness has an infirmity or impairment which may affect his capacity to testify; (2) the infirm or handicapped witness must be found legally competent to testify; (3) the infirm or impaired witness must actually testify; (4) the testimony of such witness must be crucial to the case; (5) the ability of the infirm or impaired witness to testify must actually be in issue; (6) the testimony of the impaired witness must be otherwise admissible under recognized rules of evidence; and (7) the testimony of the specialist or interested observer must not be used merely to bolster the testimony of the impaired or infirm witness."

Chow's infirmity was clearly placed in issue by testimony as to his lengthy psychiatric history, which included hospitalization for a "nervous breakdown" just weeks before the incident. The People's case hinged upon Chow's testimony and upon the

jury's evaluation of his ability to perceive, recall and relate the events of October 19, 1987. It is fundamental that a defendant is entitled to "a meaningful opportunity to be heard" *(Boddie v Connecticut,* 401 US 371, 377), and that this right includes the right to offer evidence that the infirmity of a crucial witness affects that witness's ability to perceive, to recall and to relate the relevant event. *(People v Freshley,* 87 AD2d, *supra,* at 111.)

*People v Kampshoff* (53 AD2d 325 [4th Dept 1976], *cert denied* 433 US 911), relied upon by the People and in which such expert testimony was precluded, is distinguishable. In *Kampshoff* the People's chief witness was an accomplice. The defense sought to introduce the testimony of a psychiatrist who had not treated the witness but who had concluded, based upon his observations of the accomplice in court, that the accomplice had a severe character defect, was insincere and untruthful. (53 AD2d, *supra,* at 330.) Similarly, in *People v Major* (154 AD2d 225 [1st Dept 1989]), this court reversed a conviction where the complainant's psychiatrist had been called as a witness for the sole purpose of bolstering the witness's credibility by offering an opinion that the victim had not consented to the rape, the essential issue in the case.

We have reviewed defendant's remaining contentions and find them to be without merit. Concur—Milonas, Ellerin and Smith, JJ.

Kupferman, J. P., and Sullivan, J., concur in a memorandum by Sullivan, J., as follows: I agree that the trial court's refusal to permit expert testimony regarding the complaining witness's mental condition constitutes reversible error. Comprehensive though it may have been, the evidence elicited from the witness himself regarding this condition did not, in my opinion, enable the jury to understand the condition from a scientific perspective. *(See, People v Freshley,* 87 AD2d 104, 111.) Since expert testimony would have "provide[d] the jury with an objective analytical framework for evaluation of [his] testimony" *(People v Parks,* 41 NY2d 36, 48), such testimony would not have been merely cumulative.